(No. 27513.—
WILLIAM T. SIMPSON *et al.*, Appellees, *vs.* E. S. ADKINS *et al.*, Appellants.

*Opinion filed March 21, 1944.*

ESSINGTON, BEEBE & PRATT, of Chicago, ROY C. MARTIN, CARTER HARRISON, both of Benton, J. G. VAN KEUREN, HENRY H. HARBOUR, both of Du Quoin, and FEIRICH & FEIRICH, of Carbondale, for appellants.

KERN, PEARCE & PEARCE, of Carmi, HEFNER & HARRIS, ALLEN K. SWANN, both of Evansville, Ind., WILLIAM G. EOVALDI, of Benton, J. MAX MITCHELL, and EVERETT LEWIS, both of West Frankfort, for appellees.

Mr. CHIEF JUSTICE SMITH delivered the opinion of the court:

This is a direct appeal from a decree of the circuit court of Franklin county. A freehold is involved. Appellees, William T. Simpson and certain other heirs of Elizabeth Simpson, deceased, who will hereinafter be referred to as the Simpson heirs, and others claiming under them, filed the complaint to quiet their title to certain real estate therein described. The land involved is a strip two rods wide off the east side of the north half of the north-

east quarter of the northwest quarter, and one rod off the east side of the south three-fourths of the east half of the northwest quarter of section 25, township 6 south, range 2 east of the third principal meridian, in Franklin county, Illinois.

Briefly, it was alleged in the amended and supplemental complaint, that Elizabeth Simpson, the mother of the Simpson heirs, acquired fee-simple title to the east half of the northwest quarter of section 25, on March 3, 1885; that thereafter she conveyed to others all of said tract except the strip on the east side thereof, above referred to; that Elizabeth Simpson died intestate in 1920, leaving seven children; that by her death, each of her children inherited a one-seventh interest in said strip of land. It was further alleged that in November, 1940, five of said Simpson heirs executed an oil and gas lease to L. J. Williams (this lease will hereafter be referred to as the Williams lease); that in March, 1941, the sixth of the Simpson heirs joined in said lease by the execution of a ratification agreement; that said lease was thereafter assigned by Williams to Gordon G. MacLean Crude Oil Purchasing Corporation, reserving an overriding interest therein; that thereafter, Gordon G. MacLean Crude Oil Purchasing Corporation assigned said lease to Conner X. Russell, reserving a certain interest therein. In May, 1941, after Williams had assigned his lease, dated November 29, 1940, to Gordon G. MacLean Crude Oil Purchasing Corporation, the remaining Simpson heir executed a lease to Williams, which it was alleged was obtained by fraud. He later executed another lease to one Hutchens, by whom it was finally assigned to Russell.

Certain other leases and assignments were executed which, in so far as material, will be referred to later on in this opinion. By the complaint it was further alleged that the Simpson heirs were the owners and entitled to all of the oil and gas in and under and that might be produced

from said strip of ground; they alleged that a tax deed executed by the county clerk in 1888, purporting to convey the east one acre of the east half of the northwest quarter of section 25, was invalid. They asked that said tax deed and certain other deeds in the chain of title, springing from said tax deed, be cancelled as clouds on their title. They also asked to have cancelled a certain oil and gas lease dated September 6, 1940, from Chicago, Wilmington & Franklin Coal Company to E. S. Adkins, which lease was based upon the chain of title springing from said tax deed. They also asked to have cancelled, certain other leases, particularly two "nondrilling" oil and gas leases, executed by the Simpson heirs to Adkins, on April 11, 1941. Adkins and the Chicago, Wilmington & Franklin Coal Company, together with certain other parties alleged to have or claim some interest in the property, were also named as defendants.

Before the defendants appeared, or were required to appear, an interlocutory order was entered without notice, and without requiring the plaintiffs to give a bond, appointing a receiver of the property. This order was not entered by the judge who tried the case. By that order the receiver was directed to take possession of the property, to drill and operate thereon for oil and gas, and to distribute the proceeds received for any oil or gas produced and sold therefrom, to the persons and in the proportions named and set forth in the order.

The defendants thereafter appeared and filed their motion to vacate the order appointing the receiver. The motion was denied. Upon an appeal to the Appellate Court for the Fourth District, the order denying the motion to vacate the order appointing the receiver, and the order making the appointment, were both reversed. The cause was remanded to the circuit court with directions to vacate the order appointing the receiver, and for further proceedings. *Simpson* v. *Adkins,* 311 Ill. App. 543.

After the mandate of the Appellate Court was filed in the circuit court, that court, upon notice, entered an order appointing another receiver. Prior to that time, three oil wells had been drilled on the strip of ground in question, by the former receiver. These wells were in operation and producing oil. By the order appointing the new receiver, he was directed to take possession of the property and to continue to operate the wells, as receiver, until the further order of the court.

The defendants Adkins and Chicago, Wilmington & Franklin Coal Company, together with certain other defendants, filed a joint answer to the complaint. By the answer the material allegations of the complaint, as to the ownership of the property, were denied. They admitted, however, the execution of the tax deed and the other deeds in the chain of title, springing from said tax deed, as alleged in the complaint. They alleged that said tax deed was valid and that under the chain of title springing therefrom, Chicago, Wilmington and Franklin Coal Company was the owner of the strip of ground and that Adkins had a valid oil and gas lease covering the same, executed by said coal company.

The defendants also filed a counterclaim alleging ownership of the strip of ground and the oil therein and thereunder. By the counterclaim they alleged that Adkins was the owner of the oil and gas in and under said strip; that said strip for many years had been occupied and used as a public highway; that the wells drilled thereon, under the Williams lease, constituted a public nuisance, and asked that the same be abated as obstructions on a public highway. They further asked the court to cancel the Williams lease and to confirm title to the oil and gas in Adkins, under his lease from the coal company.

Upon a hearing of the issues joined, the trial court refused to cancel the tax deed, but did cancel all of the other deeds and instruments in the chain of title springing from

said tax deed, which were alleged in the complaint to be clouds upon plaintiffs' title. The court further held that the Simpson heirs were the owners of the strip of land; that the lease executed by them to Williams was a valid lease, and that the Simpson heirs and Williams were the owners of the oil and gas in and under the strip of land involved. The court further held, however, that all of the strip of land was occupied and used for a public highway and had been so occupied and used for more than forty years; that the drilling of the oil wells on the highway and maintaining the equipment thereon constituted a nuisance and, by the decree, ordered the receiver to discontinue the operation of the wells, to cap the wells beneath the surface of the highway and remove all equipment and obstructions therefrom within a short day, fixed by the decree. From that decree, this appeal was perfected. The plaintiffs also have perfected a cross appeal challenging that part of the decree ordering the wells capped, the operation of the wells discontinued, and the obstructions removed from the highway.

The record is voluminous. In the view we take of the case, it will not be necessary to relate the facts in detail. Many collateral and evidentiary facts are found in the record. For the purposes of this case it is sufficient to state that Elizabeth Simpson, in 1885, acquired title to the entire eighty-acre tract. Thereafter, on May 5, 1896, she conveyed the north twenty acres, reserving two rods off the east side, which she did not convey. On June 15, 1904, she conveyed the balance of the eighty-acre tract. She excepted from this conveyance, however, one acre off the east side, "extending the full length of the" eighty-acre tract. This left title in her to a strip two rods in width off the east side of the north twenty acres of the eighty-acre tract, and one rod off the east side of the south three-fourths of the eighty-acre tract. The combined length of the two strips to which she retained title, was 160 rods.

The north forty rods was two rods in width, under the reservation in her deed of May 5, 1896. The south 120 rods was one rod in width, under the reservation in her deed of June 15, 1904. When she died intestate, this strip of land descended to her seven children. Proof of the deed under which Elizabeth Simpson acquired title to the entire eighty-acre tract in 1885, and the deeds showing the portions thereof, which she had conveyed in her lifetime, with the proof of her death and that her seven children were her heirs-at-law, constituted *prima facie* proof of title to the strip, in said heirs, as alleged in the complaint.

Appellants' first contention is that inasmuch as the complaint alleged the execution of the tax deed in 1888, purporting to convey the land involved, and such allegation having been admitted by the answer, plaintiffs thereby established the fact that all the interest of Elizabeth Simpson in the property was conveyed by that tax deed. Upon this premise it is argued that the plaintiffs, having made no proof showing the invalidity of said tax deed, failed to make a *prima facie* case, and that the court erred in not dismissing the complaint for want of equity.

The rule is well settled that where a tax deed is relied upon as the source of title the one claiming under the deed has the burden of proving its validity. Here the plaintiffs did not rely upon the tax deed as the source of their title or as a link in their chain of title. The allegations in the complaint with reference to the tax deed were made as a basis for asking the court to cancel that deed as a cloud on plaintiffs' title. The only effect of the failure of plaintiffs to prove the invalidity of the tax deed was to prevent them from having the same cancelled as a cloud on their title. In this state of the pleadings the allegation in the complaint that the tax deed had been issued, which was admitted by the answer, and the further allegation in the complaint that the tax deed was invalid, which was denied by the answer, in the absence of any evidence touch-

ing the validity of said deed, cannot be said to overcome the *prima facie* proof of title in the plaintiffs. The court did not err in refusing to dismiss the complaint for want of equity on this ground.

The next question presented by appellants, and which, as we view it, is decisive, is the validity of the Williams lease. It is argued that this lease was a contract for the doing of an unlawful act and was, therefore, invalid. Reference to the lease shows that it was, in form, an ordinary oil and gas lease. It shows on its face that the strip of land was leased to Williams, the lessee, "for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations and structures thereon to produce, save and take care of said products." It was further provided in the lease that it should remain in force from the date thereof, and as long thereafter "as oil or gas or either of them is produced from said land by lessee, and/or if lessee shall commence drilling operations at any time while this lease is in force, this lease shall remain in force, and its term shall continue so long as such operations continue with due diligence and if production results therefrom, then as long as production continues." After providing for the delivery to the credit of the lessors of one eighth of all oil produced, and paying them for one eighth of the gas produced, it provided: "If no well be commenced on said land on or before the 28th day of February, 1941, this lease shall terminate as to both parties." It further provided that if the first well drilled should be a dry hole, then if a second well was not commenced within twelve months, the lease should terminate.

It is obvious, therefore, from the lease itself, that the sole and only purpose for which the land was leased was the drilling and operation of oil wells thereon. That was its only consideration.

The record further shows, and the chancellor properly found, that for more than forty years the strip of ground

in question had been used by the public as a public highway; that the highway was approximately forty feet in width, along the east side of the east half of the northwest quarter of section 25. This included all of the land owned by the Simpson heirs. The evidence further shows that the road had been maintained by the public authorities and improved by placing cinders or other materials thereon. Ditches were maintained on either side of the improved portion. There was also some oral evidence tending to show that the road had been regularly laid out and established many years ago. But this is unimportant. It can not be doubted that for more than forty years it had been used as a public highway and was a public highway, either by dedication or prescription. It was so used at all times referred to in the record.

The question then arises as to the right of the owners of the fee of the land, constituting the highway, by their lease or contract, to authorize their lessee to enter upon the public highway and drill, maintain and operate oil wells, and to maintain thereon the necessary equipment for the operation of such wells and the production of oil therefrom. Also the right of the highway commissioner to enter into an agreement with the lessee, permitting such obstructions to be and remain upon the highway.

Section 221 of division I of the Criminal Code (Ill. Rev. Stat. 1943, chap. 38, par. 466,) provides that it is a public nuisance to obstruct or encroach upon any public highway. Section 222 (Ill. Rev. Stat. 1943, chap. 38, par. 467,) provides a penalty for causing or continuing such nuisance. Section 151 of the Roads and Bridges Act (Ill. Rev. Stat. 1943, chap. 121, par. 167,) provides that any person who shall injure or obstruct a public road by felling trees upon or across the same "or by placing or leaving any other obstruction thereon," shall be fined for every such offense, as therein provided.

The above section of the Roads and Bridges Act was first construed in *Boyd* v. *Town of Farm Ridge,* 103 Ill. 408. It was there said: "It is contended by counsel for appellant, that where a fence is constructed along a public highway, leaving a considerable portion of it unobstructed, as was the case here, it is, in the language of the statute, a mere *encroachment,* and not an *obstruction,* and hence it is concluded that appellant is not obnoxious to the additional penalty for permitting an *obstruction* to remain after notice by the commissioners of highways to remove it. As we understand counsel, it is conceded if appellant had built the fence across the road so as to obstruct travel altogether, he might properly have been convicted for neglecting to remove an obstruction, but that inasmuch as the fence only occupied a part of the road, and did not entirely obstruct travel, although it extended longitudinally over the road its entire length, it is claimed no liability attached for refusing to remove the fence after notice, on the ground it was a mere encroachment, and not an obstruction. We do not think this is a proper construction of the act. To hold so would be to make the liability of the accused depend, in every case of this kind, upon the direction or course of the fence with respect to the road, or upon whether its construction caused a total or partial obstruction of the highway, and we can not believe the legislature ever intended the guilt or innocence of one prosecuted under the statute should be made to depend upon matters so inconsequential as these. The object of the act was to prevent all obstructions of highways, whether total or partial, and in specifically pointing out such as might be caused by the building of fences, it was to the legislature a matter of total indifference whether they might happen to be built along or across the highway, for in either case there would be an obstruction, * * *." The same rule was announced and followed in *Seidschlag* v. *Town of Antioch,* 207 Ill. 280.

In *Gerstley* v. *Globe Wernicke Co.* 340 Ill. 270, this court said that the public is entitled to the uninterrupted, unimpeded and unobstructed use of every portion and part of public streets and alleys, and that this includes every inch or foot of such street or alleys, citing *People ex rel. Burton* v. *Corn Products Refining Co.* 286 Ill. 226, *People ex rel. Faulkner* v. *Harris,* 203 Ill. 272, *Hibbard, Spencer, Bartlett & Co.* v. *City of Chicago,* 173 Ill. 91, and *Field* v. *Barling,* 149 Ill. 556. This rule was reannounced and approved in *Ginter-Wardein Co.* v. *City of Alton,* 370 Ill. 101.

By the language of the lease, Williams, the lessee, was obligated to drill, maintain and operate oil wells, and to build tanks, power stations and structures, in a public highway. The lease recites that this is its "sole and only purpose." Its continuance in force was dependent upon the commencement of the drilling of a well on or before February 28, 1941. Its continuance thereafter, if oil was found, was dependent upon the continued operation of the well and the production of oil therefrom, and the maintenance of the necessary equipment to carry out that purpose. Even without these express covenants in the lease, it carried with it an implied covenant to drill wells and operate the same. *Daughetee* v. *Ohio Oil Co.* 263 Ill. 518.

It is true there is some evidence and some argument in the record that the three wells actually drilled were not on the traveled portion of the highway. But this could make no difference. There is no contention that they are not within its boundaries. The public rights do not extend only to the traveled portion of the highway. The evidence shows that highway ditches were maintained on either side of the traveled portion of the road. It is a matter of dispute as to how much of the traveled portion of the highway was occupied by the wells and the equipment. It is undisputed, however, that the wells were drilled and the equipment maintained between the highway ditches. There is in the record, the further significant fact that the high-

way covered all of the land owned by the Simpson heirs, and which was covered by the lease. The photographs in the record show that each well, with its equipment, occupies substantially one half the space between the side ditches.

In *Estate of Ramsey* v. *Whitbeck*, 183 Ill. 550, it was said, on the authority of *Tobey* v. *Robinson*, 99 Ill. 222, *Tenney* v. *Foote*, 95 Ill. 99, *Henderson* v. *Palmer*, 71 Ill. 579, and *Nash* v. *Monheimer*, 20 Ill. 215, that "nothing is better settled in the law of contracts than that if any part of the consideration upon which a promise rests is illegal the entire promise fails."

In *Corcoran* v. *Lehigh and Franklin Coal Co.* 138 Ill. 390, the following language was used: " 'When the immediate object of an agreement is unlawful, the agreement is void, when there are contained in the same instrument distinct engagements, by which a party binds himself to do certain acts, some of which are legal and some illegal at common law, the performance of those which are legal may be enforced though the performance of those which are illegal can not.' (3 Am. and Eng. Ency. of Law, 886.) 'When you can not sever the illegal from the legal part of a covenant the contract is altogether void; but when you can sever them, whether the illegal be created by statute or common law, you may reject the bad part and retain the good.' " Here there could be no severance. Every obligation assumed by Williams in the lease was to do an act positively forbidden by law, and for which a penalty is provided. When the unlawful provisions of the lease are disregarded, nothing remains. Its "sole purpose" was the doing of the unlawful acts enumerated therein.

In *Douthart* v. *Congdon*, 197 Ill. 349, this court quoted from *Miller* v. *Ammon*, 145 U. S. 421, as follows: " 'The general rule is, that a contract made in violation of a statute is void, and that when plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover. * * * There can be no civil right

where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal. * * * It is true that a statute containing a prohibition and a penalty makes the act which it punishes unlawful, and the same may be implied from a penalty without a prohibition. * * * Where the statute is silent and contains nothing from which the contrary may be inferred a contract in contravention of it is void.'" The same rule was announced in *First Nat. Bank* v. *Miller*, 235 Ill. 135.

In *Lyons* v. *Schanbacher*, 316 Ill. 569, it was said: "The invalid provision was so material a consideration that it rendered the entire contract invalid. The rule has long been established that if any part of the entire consideration for a contract is illegal the whole contract is void. When valid provisions of a contract are blended with invalid provisions the whole contract will be void. That which is bad destroys that which is good and both perish together. *Crichfield* v. *Bermudez Paving Co.* 174 Ill. 366; *Douthart* v. *Congdon*, 197 id. 349; *First Nat. Bank* v. *Miller*, 235 id. 135; *Hill* v. *Hill, supra* [12 L. R. A. (n. s.) (N. H.) 848]." The same rule was again announced and followed in *Voch* v. *Voch*, 365 Ill. 432, citing *First Nat. Bank* v. *Miller*, 235 Ill. 135.

In *Frankel* v. *Allied Mills, Inc.*, 369 Ill. 578, the court said: "The rule is that when a statute declares that it shall be unlawful to perform an act, and imposes a penalty for its violation, contracts for the performance of such act are void and incapable of enforcement."

The above cases demonstrate conclusively that a contract which requires one of the parties to maintain a nuisance or other obstruction on the public highway is contrary to law, and has no validity. Such contracts cannot be enforced in an action between the parties, or as against the rights of the public or third persons. The parties to such a contract can acquire no rights thereunder, either as against each other, or as against third parties, or the public.

This rule does not rest alone in the public policy. It is founded upon a positive rule of law.

To meet and obviate the operation of this rule, appellees argue that the wells in question are not an unlawful encroachment upon the highway; that oil wells may be lawfully maintained upon a highway, provided they do not totally obstruct traffic thereon. In support of this contention they cite and rely upon *Sears* v. *City of Chicago,* 247 Ill. 204, *Tacoma Safety Deposit Co.* v. *City of Chicago,* 247 Ill. 192, *Tolman & Co.* v. *City of Chicago,* 240 Ill. 268, *Snyder* v. *City of Mt. Pulaski,* 176 Ill. 397, and *Postal Telegraph-Cable Co.* v. *Eaton,* 170 Ill. 513. An examination of these cases, however, discloses that they do not support appellees in their contention.

*Sears* v. *City of Chicago,* and *Tacoma Safety Deposit Co.* v. *City of Chicago,* both involved the right of the city to charge for the use of the space beneath the sidewalks. The conclusion reached was that where the city owned the fee in the street, it had the right to charge for the use of the space beneath the sidewalks, but where the city had only an easement and the fee was in the adjoining property owner, no such right exists.

In *Tacoma Safety Deposit Co.* v. *City of Chicago,* it was said: "The contention is made by the complainant that the city is without power to pass an ordinance requiring persons who use subways beneath sidewalks adjoining their property to pay compensation for the use of such space. The position of the complainant, we think, is well founded as to subways beneath sidewalks in streets of which such persons are the owners in fee, but as to subways beneath the sidewalks in streets in which the fee is in the city or in the State, and which are held for the use of the city, we do not think this is true." That was a suit brought by an abutting property owner to enjoin the enforcement of an ordinance requiring property owners to pay for the use of space under the sidewalks. The case of *Sears* v. *City of*

*Chicago* was a similar case to enjoin the enforcement of the same ordinance. It was said in the course of that opinion: "Whatever title the city has in its streets and other public grounds is held in trust for the public, and this is true whether it owns the fee or only an easement. The interest of the public, which is the primary object of the trust, must always be paramount to all other interests. The city cannot grant away the rights of the public, nor can they be encroached upon by private individuals, with or without the consent of the municipality, to the detriment of the superior rights of the public. Elliott on Roads and Streets, sec. 17; *State* v. *Murphy,* 134 Mo. 548, 34 L. R. A. 369; *Matthiessen & Hegeler Zinc Co.* v. *City of LaSalle,* 117 Ill. 411."

In the case of *Tolman & Co.* v. *City of Chicago,* 240 Ill. 268, the property owner claimed the right to extend skids and other equipment across the sidewalk, temporarily and at intervals, for the purpose of unloading merchandise and moving the same into his place of business. The city had attempted to prohibit him at all times from doing this. By his suit he asked that the city be enjoined from interfering with necessary and temporary use of the skids across the sidewalk. In the course of the opinion it was said: "A merchant may use and temporarily obstruct the street and sidewalk in front of his premises for loading and unloading goods when not restrained by ordinance, if he does not unnecessarily or unreasonably interfere with their use by the traveling public. (*Welsh* v. *Wilson,* 101 N. Y. 254; *Halsey* v. *Rapid Transit Street Railway Co.* 47 N. J. Eq. 380; *Tompkins* v. *North Hudson Railroad Co.* 63 N. J. L. 322.) Skids may be used in a reasonable manner, so as not to unnecessarily encumber or obstruct the sidewalk, for the purpose of facilitating the removal of the merchandise. * * * The extent of the right thus to interfere with the public's free and uninterrupted enjoyment of the use of the sidewalk depends upon the neces-

sity of the case so far as the individual is concerned and the reasonableness of the use against the public. It is said in *Flynn* v. *Taylor*, 127 N. Y. 596: 'The owner of land abutting upon a public street is permitted to encroach on the primary right of the public to a limited extent and for a temporary purpose, owing to the necessity of the case. Two facts must, however, exist to render the encroachment lawful: (1) The obstruction must be reasonably necessary for the transaction of business; (2) it must not unreasonably interfere with the rights of the public. * * * The foundation upon which the exception seems to rest is, that it is better for the public to suffer a slight inconvenience than for the adjacent owner to sustain a serious loss. Any unnecessary or unreasonable use of a street, however, is a public nuisance.' "

Here the use of the highway was in no sense temporary. The lease obligated the lessee to continue the obstructions as long "as oil or gas, or either of them, is produced from said land." If oil was produced, which it was, the undertaking was of a continuous and permanent character.

The case of *Postal Telegraph-Cable Co.* v. *Eaton*, 170 Ill. 513, was a suit in ejectment brought by the owner of the fee of the highway to prevent a telegraph company from maintaining its poles in the highway. This is a public purpose and a lawful use of the highway. (Ill. Rev. Stat. 1943, chap. 134, par. 4.) It was held that the use of the highway for the erection and maintenance of poles, without the consent of the owner of the fee, was an additional burden for which such owner could maintain ejectment.

The case of *Snyder* v. *City of Mt. Pulaski*, 176 Ill. 397, involved the right of a private individual to maintain a well in a public street for private purposes. It appears that the city had first granted the right to maintain and operate the well for a definite period of twenty years. The

right to maintain and operate the well was granted by an ordinance passed on March 24, 1891. On December 13, 1895, he purchased certain new pipe and apparatus for the purpose of placing the same in the old well. On December 21, 1895, and while he was engaged in the work of installing the new equipment in the well, the ordinance was repealed. He was then notified to discontinue the installation of the equipment. Thereupon, the street commissioner tore down the derrick he was using for installing the new equipment, and filled in the well with dirt and rubbish. He, thereupon, filed the suit and obtained a temporary injunction, restraining the city from interfering with him in the installation of the new equipment. On a hearing the temporary injunction was dissolved and the suit was dismissed. This action of the trial court was affirmed by the Appellate Court, and, on appeal to this court, the judgment of the Appellate Court was also affirmed. In the course of the opinion it was said: "There being no power in the city to make a discrimination in the use of the streets in favor of appellant, and permit him to have a permanent private use of the same or to part thereof, if it has done so the most that can be said is, it amounted to a mere license that would not render him amenable to punishment for a violation of an ordinance of the city in obstructing the street. Such permission to so use the street is not binding upon the city, and is not irrevocable. The municipality having no power to grant such permanent use, there can be no estoppel against it from requiring the street to be open in its entirety, because no estoppel can arise from an act of the municipal authorities done without authority of law. (*Seeger* v. *Mueller,* 133 Ill. 86; *Pettis* v. *Johnson,* 56 Ind. 139; *Stevens* v. *St. Mary's Training School,* 144 Ill. 336; *Day* v. *Grieb,* 4 Cush. 433.) There was power in the city council to pass the ordinance repealing the former ordinance granting the right to appellant to use the street, for such former ordinance, being without

authority of law, might well be rescinded. Appellant acquired no right under the former ordinance against the public, nor did he acquire any right against the municipality by estoppel, nor by any right conferred by the ordinance, because the right conferred was a mere private use, and that private use created a purpresture."

That case does not hold, as argued, that a permit or license may be lawfully granted to maintain a permanent obstruction in a highway or street. On the contrary it was there said that the city had "no power to grant such permanent use." It was there argued that the city, having first granted the right by ordinance, was estopped to revoke the grant during the term for which it was granted. In answer to this contention the court said: "There can be no estoppel against it from requiring the street to be open in its entirety, because no estoppel can arise from an act of the municipal authorities done without authority of law."

Whether the purported authorization of the commissioner of highways for the erection and maintenance of the obstructions would operate to relieve the lessee of the penalties provided by statute is not involved in this case, and we express no opinion on that question. Nevertheless, such authorization could not legalize the unlawful obstructions or purge the lease of its unlawful obligations.

It follows that the last two cases are directly opposed to the contentions of appellees, while the other three give them no aid. There is no suggestion in either of those cases that the right to obstruct a street or highway may be given by any authority or in any manner acquired.

The Simpson heirs, being the owners of the fee to the property in question, also owned all oil and gas in and under, and that might be produced from, said premises. This, however, gave them no right to obstruct the highway in recovering the oil. Neither could they authorize their lessee to do so. As owners of the oil and gas they have a right to recover the same by any means which will

not create an unlawful obstruction on the highway. After they had executed the Williams lease, they did enter into a "nondrilling" lease with Adkins. By that lease it was expressly provided that no wells should be drilled upon the leased property; that the oil and gas be recovered through wells drilled on adjacent lands, in accordance with a community agreement entered into with the owners of such adjacent lands. Under this agreement the Simpson heirs are entitled to receive their proportionate share of oil and gas recovered. The distribution is to be based upon the ownership of lands covered by the community agreement,—each interest receiving its proportionate share. This contract was legitimate and enforceable. It involved no violation of the law. Both the so-called "nondrilling" lease or contract, and the communitization agreement, entered into in connection therewith, are valid.

Under the above rule, all of the leases executed by the Simpson heirs providing for the drilling of oil wells upon the strip of ground in question, while the same is occupied and used for highway purposes, are invalid. Such leases should be cancelled as contracts for the doing of unlawful acts.

In view of this holding, it is unnecessary to consider any other questions raised, either on the appeal or the cross appeal.

The court erred in holding the lease executed on November 29, 1940, by W. E. Vancil and other, to L. J. Williams, (identified in the record as plaintiffs' exhibit D,) and the ratification of said lease by Isaac N. Simpson and wife, dated March 26, 1941, (identified in the record as plaintiffs' exhibit E,) valid and effective. It also erred in holding the nondrilling leases, executed on April 11, 1941, by the same parties to E. S. Adkins (identified in the record as defendants' exhibits 1 and 3,) void and of no effect, and in cancelling the same. The decree of the court below, to

that extent, is reversed. In all other respects, the decree is affirmed.

The cause is remanded to the circuit court of Franklin county with directions to modify the decree so as to hold and decree that the said lease dated November 29, 1940, plaintiffs' exhibit D, and said purported ratification, dated March 26, 1941, plaintiffs' exhibit E, and all assignments thereof, are invalid and ineffective, and to cancel the same of record, and with directions to further modify said decree so as to hold and decree that the two nondrilling oil and gas leases, executed April 11, 1941, defendants' exhibits 1 and 3, are valid and effective, and enforceable as such, and for further proceedings not inconsistent with the views herein expressed.

*Affirmed in part and reversed in part, and remanded, with directions.*