Venis Meyer, Plaintiff-Appellee, v. Gerald Buckman,
Defendant-Appellant.

Gen. No. 10,854.

Second District.

October 27, 1955.

Rehearing denied November 15, 1955.

Released for publication November 16, 1955.

E. F. Petersen, of Kankakee, for appellant.

Dyer and Dyer, of Kankakee, for plaintiff-appellee.

MR. JUSTICE CROW delivered the opinion of the court.

This is an appeal from a judgment for $820 in favor of the plaintiff, upon the finding of the lower Court, sitting without a jury, in an action for breach of a contract to permit the plaintiff, a house mover, to move a dwelling house for the defendant.

The complaint alleged, in substance, that on or about January 27, 1953, the plaintiff and defendant entered into an agreement, partly oral and partly in writing, that the plaintiff would move a dwelling house owned by the defendant from its location on South Alma Avenue, Kankakee Township, to another location seven blocks away for a consideration of $900, starting January 31, 1953; that on January 29, 1953, the defendant requested the plaintiff to wait two weeks before moving the house, and the plaintiff agreed; that on or before February 5, 1953, the defendant breached the agreement, as modified, by hiring another house mover to move the house, without the consent of the plaintiff,

which other house mover completed the moving, thereby preventing the plaintiff from moving the house; and that the plaintiff was at all times on and after February 5, 1953, ready, willing and able to move the house.

The defendant's answer denied most of the material allegations of the complaint, and set forth as an affirmative defense that the contract was illegal, void, and unenforceable because the plaintiff did not have workmen's compensation insurance, or other security approved by the Industrial Commission, and the plaintiff intended to pursue his occupation in violation of Section 4 (a) and (d) of the Workmen's Compensation Act, the plaintiff having allegedly told the defendant those circumstances and his intentions. The plaintiff's reply, so far as presently material, was that he did not have workmen's compensation insurance at the time of the contract with the defendant, he intended to move the house without obtaining workmen's compensation insurance, no reference was had between him and the defendant as to other possible security under that Act, and the contract did not contemplate that he pursue, and he did not intend to pursue, his occupation in violation of Section 4 (a) and (d). In addition, the defendant's further defenses, as developed at the trial, are that the plaintiff's evidence of anticipated loss of profits was insufficient to justify the judgment, and that the removal of a particular dwelling house constitutes a new venture as to which loss of anticipated profits is not a proper element of damages.

The written contract of January 27, 1953, offered and admitted in evidence, is as follows:

### "CONTRACT"

"This contract, drawn this 27th day of Jan., in the year of our Lord Nineteen Hundred and 1953, between Gerald Buckman, party of the first part, a resident of the KKK of KKK County of Ill., State of ———, and Venis Meyer, Party of the second part, a resident of

388

the Village of Manteno, County of Kankakee, and State of Illinois, and containing the following agreements and considerations:

"Party of the second part agrees to move house, owned by party of the first part, located in KKK, to be delivered on lot owned by party of the first part in KKK.

"For such services, party of the first part agrees to pay party of the second part $900.00.

"Party of the first part agrees to pay $400.00 to the party of the second part for services rendered to date when said house is placed on rollers, and the balance to be paid when the house is delivered on lot owned by party of the first part in KKK.

"Party of the second part agrees to move house from old location to new, the distance of 7 blocks feet, ——— miles for the price of $900.00.

"All wires and Right of Way taken care of by party of the first part.

(s) Venis Meyer

Witnesses

(s) Gerald Buckman"

The plaintiff was the sole witness on his own behalf, and the defendant was the sole witness on his behalf. The evidence is undisputed that the written contract was entered into and also that the defendant on January 29, 1953, requested the plaintiff, after the contract was signed, to "hold back a week" from moving, which was consented to by the plaintiff, the defendant saying he would call the plaintiff when he wanted the plaintiff to move it, which the defendant did not do; a little after a week the plaintiff found that one Nesbitt, another house mover, was in the process of moving the house; the defendant gave the plaintiff as an excuse for the requested one week's delay that the defendant's partner was trying to sell a hot water system to Nesbitt's son, the defendant was in a predicament, and

389

when he could get the deal through, he would notify the plaintiff. Either on January 27 or January 29 the plaintiff told the defendant that he hadn't renewed his workmen's compensation insurance, but if he needed such he would get it.

The defendant at the outset was informed that the plaintiff would use his sons for help. The two sons were 14 and 17 years of age and in school, except on Saturday and Sunday. The plaintiff testified that in order to move the house three persons would be engaged and about 48 hours would be spent on the job. To move the house down the street would take a truck driver, the plaintiff, and a laborer, which would take one day; that it would take three men one day to set up the house on the new location; and that the two boys could do the amount of work comparable to a skilled man.

The plaintiff further testified that he had been in the house moving business 33 years, moving about 10 houses a year, could move the house with his two old trucks, himself, and the two boys, and estimated the cost of moving at $80, being about $30 for the cost of gas, and about $50 for the breaking of planks and blocks in moving, that being, he said, the usual and customary breakage on the average size house, with no wage expense for the two boys, the plaintiff not paying the boys anything. He stated that the last time he had had men employed was in November 1952; that he did not keep track of depreciation on his equipment; that the trucks were a 1929 International bought in 1940 for $100, and a Chevrolet bought secondhand in 1936 for about $200; that he would have used certain moving wheels in which he had $100 invested, and about eight jacks his father had left him and he bought some for $3 apiece, the jacks being worth about $3 each; the only other tool he would have used was a sledge hammer; he would have had no certain expense for wear and tear; and he said he would have made an $820 profit on the contract.

The defendant says that the plaintiff could not have performed the contract without having been in violation of Section 4 (a) and (d) of the Workmen's Compensation Act and subject to the penalty provided therein. Those portions of the Act, Ch. 48, Ill. Rev. Stats. 1951, pars. 138.4, subds. (a) and (d) [Jones Ill. Stats. Ann. 143.67, subds. (a), (d)], are as follows, so far as material:

"138.4 Provision to insure payment of compensation —Existing insurance or relief association—Liability of insurance carrier.) Sec. 4. (a) Any employer who shall come within the provisions of Section 3 of this Act, and any other employer who shall elect to provide and pay the compensation provided for in this Act shall:

"(1) File with the Commission an application for approval as a self-insurer which shall include a current financial statement. Said application and financial statement shall be signed and sworn to by the president or vice-president and secretary or assistant secretary of said employer if it be a corporation, or by all of the partners if it be a co-partnership, or by the owner if it be neither a co-partnership nor a corporation.

"If the sworn application and financial statement of any such employer does not satisfy the Commission of the financial ability of the employer who has filed it, the Commission shall require such employer to,

"(2) Furnish security, indemnity or a bond guaranteeing the payment by the employer of the compensation provided for in this Act, or

"(3) Insure his entire liability to pay such compensation in some insurance carrier authorized, licensed, or permitted to do such insurance business in this State. All policies of such insurance carriers, insuring the payment of compensation under this Act shall cover all the employees and the entire compensation liability of the insured. Any provisions in such policy, or in any endorsement attached thereto, attempting to limit or

391

modify in any way, the liability of the insurance carriers issuing the same shall be wholly void.

"Nothing herein contained shall apply to policies of excess liability carriage secured by employers who have been approved by the Commission as self-insurers, or

"(4) Make some other provision, satisfactory to the Commission, for the securing of the payment of compensation provided for in this Act, and

"(5) Upon becoming subject to this Act and thereafter as often as the Commission may in writing demand, file with the Commission in form prescribed by it evidence of his compliance with the provision of this section.

"(d) The failure or neglect of an employer to comply with any of the provisions of paragraph (a) of this Section or the failure or refusal of an insurance carrier to comply with any order of the Industrial Commission pursuant to paragraph (c) of this section shall be deemed a misdemeanor punishable by a fine of not less than $100.00 nor more than $500.00 for each day of such refusal or neglect until the same ceases. Each day of such refusal or neglect shall constitute a separate offense."

In addition, it may be observed that Section 26 of the Act (Ch. 48, Ill. Rev. Stats. 1951, par. 138.26 [Jones Ill. Stats. Ann. 143.89]) also provides:

"138.26 Penalties.) Sec. 26. Any wilful neglect, refusal or failure to do the things required to be done by any section, clause or provision of this Act, on the part of the persons herein required to do them, or any violation of any of the provisions or requirements hereof, or any attempt to obstruct or interfere with any court officer, or any other person charged with the duty of administering or enforcing the provisions of this Act, shall be deemed a misdemeanor, punishable by a fine of not less than $10.00 nor more than $500.00, at the discretion of the court."

392

It is the defendant's contention that the plaintiff, as a house mover, was engaged in an "extra hazardous" enterprise and hence the provisions of the Act applied automatically to him, as an employer, and his employees, and that the plaintiff's two minor sons were or would have been employees under the Act. Section 3 (1) of the Act (Ch. 48, Ill. Rev. Stats. 1951, par. 138.3 [Jones Ill. Stats. Ann. 143.66]), provides, so far as material:

"138.3 Automatic application of act.) Sec. 3. The provisions of this Act hereinafter following shall apply automatically and without election . . . to all employers and all their employees, engaged in any department of the following enterprises or businesses which are declared to be extra hazardous, namely:

"1. The erection, maintaining, removing, remodeling, altering or demolishing of any structure, except as provided in sub-paragraph 8 of this section."

The first question is whether the Trial Court erred in not holding that the agreement of the parties was illegal, void, and unenforceable, and in not dismissing the complaint for that reason. We think there was no error in that respect.

The alleged defense of "illegality, that an instrument or transaction is either void or voidable in point of law, or cannot be recovered upon by reason of any statute" is an affirmative defense and the burden of proof thereon is on the defendant: Ch. 110, Ill. Rev. Stats. 1953, par. 167 [Jones Ill. Stats. Ann. 104.043]; Scanlon v. Warren (1896), 68 Ill. App. 213; Anderson v. Carlson (1902), 99 Ill. App. 514. And cf: Victor v. Dehmlow (1950), 405 Ill. 249.

We shall assume, for the purposes of this case, and without so deciding, that the house moving business is an "extra hazardous" enterprise or business, that the provisions of the Workmen's Compensation Act hence apply automatically and without election to all employers and all their employees engaged therein, that

the plaintiff had or would have had persons (his minor sons) in service or under a contract of hire, express or implied, oral or written, and hence was or would have been an "employer," and that his sons were or would have been in his service under a contract of hire, express or implied, oral or written, and hence were or would have been "employees," all within the meaning of Sections 1 and 3 of the Act (Ch. 48, Ill. Rev. Stats. 1951, pars. 138.1 and 138.3 [Jones Ill. Stats. Ann. 143.64, 143.66]). There may be considerable doubt on one or more of those scores, particularly considering that the burden of proof thereon is, under the circumstances, on the defendant, but in the view we take of the case it is immaterial, and such may be so assumed for this purpose.

There is certainly nothing illegal, per se, about the contract of the parties by which the plaintiff agreed to move the house, and the defendant agreed to pay him a certain sum for doing so. The purpose or object, the promise of each party, and the consideration moving both ways were all perfectly legal. It was not a contract to do an illegal act. Nothing at all is said in the written contract about the Workmen's Compensation Act. As to the plaintiff's future performance thereof, although his reply says he intended to move it without obtaining workmen's compensation insurance, the circumstances that no reference was evidently had in the parties' conversations to other possible security under the Act, that the plaintiff says he did not intend to pursue his occupation in violation of Section 4 (a) and (d), and the defendant's own testimony that the plaintiff told him that if he needed workmen's compensation insurance he would get it, all leave in some considerable doubt what the plaintiff's intentions were in that respect as to the future performance of the contract, and, the burden of proof being on the defendant on this point, it is not established that the plaintiff in fact

394

intended, in his future performance of the contract, to violate Section 4 (a) and (d).

At the time of the making of the contract, January 27, 1953, the plaintiff did not have workmen's compensation insurance. But such insurance, although undoubtedly the most common method under Section 4 of the Act (Ch. 48, Ill. Rev. Stats. 1951, par. 138.4) for an employer to secure the payment of any compensation under the Act, is, in fact, only one of four different possible alternative methods for doing so, the others being to file an application for approval as a self-insurer, or to furnish security, indemnity, or a bond, or to make some other provision satisfactory to the Commission. That the plaintiff at that time did not have workmen's compensation insurance does not mean he may not have adopted one of the other alternative methods for securing the payment of any compensation under the Act, and, the burden of proof being on the defendant, and the record being completely silent in this regard, we cannot simply assume that the plaintiff had not adopted one of such other alternative methods. Hence, it is not established that at the time of the making of the contract the plaintiff was, in fact, in violation of Section 4 (a) and (d).

■ Furthermore, even had it been established, and even had the defendant satisfied the burden of proof, that the plaintiff was in violation of Section 4 (a) and (d) at the time of the making of the contract, or that the plaintiff intended in his future performance to violate Section 4 (a) and (d), such does not make the contract itself illegal, void, and unenforceable.

Sections 4 and 26 of the Workmen's Compensation Act do not expressly provide that a contract made by an employer, such as the plaintiff, with a third person, such as the defendant, shall be illegal, invalid, null, and void, if the employer at the time of the making thereof is in violation of Section 4 or if he intends in his future performance thereof to be in violation of Section 4.

Section 4 of the Act does provide in another subparagraph, — (g), in part, that "Any contract . . . of employment providing for relief benefit, or insurance or any other device whereby the employee is required to pay any premium or premiums for insurance against the compensation provided for in this Act shall be null and void." That is the only provision in Section 4 that specifically provides that any contract in violation of the provisions thereof is null and void. The Legislature having specifically so provided as to such contracts of employment, and not having so provided as to other types of contracts such as the one here involved, we can only assume the Legislature meant what it said and necessarily did not intend to provide that other contracts of a different type in violation thereof should be null and void. The enumeration of certain things in a statute implies the exclusion of all other things, expressio unius est exclusio alterius, we cannot read into the statute, by implication, an intent of the Legislature to make some other kind of contract illegal, null, and void when the Legislature, being presumably and evidently cognizant of the problem, has not expressly so provided: People v. Collins (1933), 351 Ill. 551; In re Estate of Tilliski (1945), 390 Ill. 273.

The title of the Workmen's Compensation Act is "An Act to promote the general welfare of the people of this State by providing compensation for accidental injuries or death suffered in the course of employment within this State, and without this State where the contract of employment is made within this State; providing for the enforcement and administering thereof, and a penalty for its violation, and repealing an Act therein named" (Laws, 1951, p. 1060). The title would indicate that its basic object is to provide compensation for accidental injuries or death suffered in the course of employment, not to regulate the contractual relations between an employer and some third party; and the fact that, by the title, the enforcement and adminis-

tering of the Act are provided for in the Act as well as a penalty for its violation, is persuasive at the outset that the Act and only the Act is to be looked to to determine the method or methods of enforcement thereof and that for any violation thereof it is the penalty or penalties provided therein and only the penalty or penalties so provided therein that are to be applied.

■ The essential general purpose of the Act is to substitute an entirely new system of rights, remedies, and procedure for all previously existing common-law or statutory rights and liabilities between employers and employees for accidental injuries or death arising out of and in the course of employments operating under and subject to the Act: Angerstein, Ill. Work. Comp., Vol. 1, p. 23; it was enacted primarily for the protection of the employee: Henson Robinson Co. v. Industrial Commission (1944), 386 Ill. 232; it is designed to afford employees and their dependents a measure of financial protection, and the basis upon which its validity has been sustained is as a regulation of the master-servant relation: Grasse v. Dealer's Transport Co. (1952), 412 Ill. 179. To say that it was impliedly intended to regulate the contractual relations between an employer and some third party and to determine the legality or illegality of their contract, is, in the absence of some express provision of the Act to that effect, foreign to the essential, general, primary purpose of the Act, and not consonant with its fundamental basis as a regulation of the master-servant relation.

The subject heading of Section 4 of the Act (Ch. 48, Ill. Rev. Stats. 1951, par. 138.4) is "provision to insure payment of compensation—existing insurance or relief association—liability of insurance carrier." Consonant with its subject heading, the essential purpose of subsections (a) and (d) thereof is to enable the Industrial Commission to require all employers under the Act to make suitable and adequate provisions for the payment

397

of compensation in all cases of accidental injury or death of their employees; the ultimate purpose is to provide financial protection for the payment of compensation which may become due employees or their dependents; subsection (d) makes a misdemeanor the failure or neglect of an employer to comply with the provisions of subsection (a) and provides criminal penalties therefor: Angerstein, Ill. Work. Comp., Vol. 2, pp. 2, 13. The subject heading and essential purpose of the Section do not embrace, by implication, the regulation of the contractual relations between an employer and a third party as are here concerned and the legality or illegality of their contract.

The subject heading of Section 26 of the Act (Ch. 48, Ill. Rev. Stats. 1951, par. 138.26) is "penalties." Consonant with its subject heading, the criminal penalties provided therein, and the misdemeanors thereby created are distinct and separate from the misdemeanors and penalties provided under Section 4, above: Angerstein, Ill. Work. Comp., Vol. 3, p. 157.

Having so expressly provided in Sections 4 (d) and 26 for the consequences of an employer's failure, neglect, or refusal to comply with the provisions of Section 4 (a), as well as other parts of the Act, having made such a criminal misdemeanor and provided criminal penalties, and not having expressly provided for any further possible consequence or penalty by way of making the employer's contract with a third party illegal, null, and void, the Legislature, again, must be assumed to have meant what it said and necessarily did not intend to provide that such contracts should be illegal, null and void. Again, the enumeration of certain things in the statute implies the exclusion of all other things.

In Edgerton v. Preston (1884), 15 Ill. App. 23, the plaintiffs, partners, doing business under the name of "Garden City Veneer Mills" sued the defendant bankers to recover the proceeds of certain checks drawn by

a debtor of the firm on the bankers, payable to the plaintiffs' order under that firm name, which had been allegedly improperly endorsed by an employee of the plaintiffs who had embezzled the money. A judgment for the defendants was reversed and remanded. Among other things, the defendants claimed the plaintiffs were doing business under an assumed corporate name without being incorporated, in violation of Section 220 of the then Criminal Code, which provided a certain fine for violations thereof. The Court held, so far as material, that such was no defense, and said, pp. 26–27:

". . . Nor do we think that, even if it should be found there had been a violation of the statute, the consequences of such violation could be extended beyond the infliction of the penalty therein prescribed. The statute does not provide that contracts made by persons thus offending shall be invalid, but only renders such persons liable to pay a fine of not less than ten dollars nor more than two hundred dollars, and a like sum for each day they shall continue to offend."

In People v. Rose (1905), 219 Ill. 46, the petitioners sought an original writ of mandamus against the defendant Secretary of State to compel issuance of a certificate of incorporation to a new "United States Express Company," despite the fact there was and had been for years an old New York joint stock company by the same name. Among other things, the petitioners urged that the old company, if not incorporated, had no right to use the name "United States Express Company" because the Criminal Code made it an offense to assume and use a corporate name without being incorporated, and imposed certain fines for doing so. The Court held that made no difference, denied the petition, and said, p. 63:

"It is furthermore to be observed that this criminal statute does not make contracts, made by persons guilty of the offense prohibited, invalid, but merely provides that such persons shall be liable to pay a cer-

tain fine. It would appear, therefore, that a violation of the statute can be attended with no other consequences than merely the infliction of the penalty therein prescribed. (Edgerton v. Preston, supra.)"

In Grody v. Scalone (1950), 408 Ill. 61, the plaintiff, an individual doing business as Modern Furnace Company, sued the defendant for a balance allegedly due on a contract for the installation of a furnace. Among other things, the defendant's answer, in what was called Count 2, set up an alleged special affirmative defense. The plaintiff's motion to strike that defense was denied. The plaintiff replied. The defendant moved for judgment on the pleadings, which was allowed as to that special defense in Count 2. The special defense was that the plaintiff was in business under an assumed name, he had failed to register the same and file the necessary certificate under the assumed name act (Ch. 96, Ill. Rev. Stats. 1947, pars. 4–8 [Jones Ill. Stats. Ann. 37.414(1)–37.414(5)]), which provided penalties of a fine, or imprisonment, or both, for violations thereof, the contract was therefore against public policy, the plaintiff was unlawfully in business, and could not legally enforce the contract. The Court held to the contrary, and reversed and remanded with directions to sustain the plaintiff's motion to strike the special defense. The Court said, in part, pp. 64–65, 65–66, 66, and 67—

"The question presented to us is to determine the intent of the legislature as to whether or not it intended, in addition to subjecting the plaintiff here to an expressed penalty, to impose the additional and greater penalty of refusing him any relief on his contract entered into without compliance with the statute. In cases of this character, whatever decisions to the contrary may be found, there is no inflexible rule of arbitrary application for the determination of the effect by implication of the prohibitory statute. The question presented is one of legislative intent to be gathered

from the language of the statute read in the light of the circumstances with which it deals, with such considerations of public policy as may be involved in the conflicting claims of construction.

"A reading of this act as to its prohibition does not specifically set out that such transaction as is now before us is prohibited. It only fixes a penalty for persons conducting a business in violation of the act. To deny recovery in a case, such as the instant case, would be affording a means by which a person having received a benefit from another would be enabled to retain it without compensation. A careful examination of the statute before us presents two pertinent facts: (1) That it expressly imposes a penalty for nonobservance in the form of a fine or imprisonment; and, (2) that no further penalty or consequence is attached. This, it would seem, is a significant indication of a purpose that the penalty expressed in that particular kind of case should be exclusive.

"The act pertaining to assumed business names makes no restriction pertaining to suits or recovery, but specifically provides a penalty for conducting or transacting a business in this State under an assumed name in violation of the statute.

"The appellee cites the case of Colbert v. Ashland Construction Co. 176 Va. 500, 11 S.E.2d 612, along with several other foreign cases in support of the opposite Rule. We are of the opinion, however, the rule, as above pointed out, is the one properly to be followed unless there should be a provision which specifically provides for additional penalty. This also follows the rule of strict construction of such statute."

The defendant says Grody v. Scalone deals only with the assumed name statute,—in that case the contract was executed, whereas here it is executory,—and it does not refer to Douthart v. Congdon (1902), 197 Ill. 349, a case urged by the defendant. Necessarily Grody v. Scalone deals only with the assumed name statute,—

401

that is what was before the Court,—but its principles and language are very closely analogous to the case at bar; that the contract there was executed, whereas here it is executory, does not seem to make any difference so far as the principles are concerned, although such might have made the plaintiff's so-called "fireside equities" a little stronger there than here; and we perceive no particular significance in its not referring to Douthart v. Congdon. Grody v. Scalone seems to be the latest expression of the Supreme Court in this general field and we must be guided thereby.

We do not believe the consequences of a violation or intended violation of Section 4 by the plaintiff, if he so did or so intended, extend beyond the infliction of the criminal penalties prescribed by the Act, or that the Legislature, by implication, intended, in addition to the criminal penalties, to impose the additional and possibly greater penalty of determining his contract with the third party to be illegal, null and void. The statute imposes no restriction or inhibition on the plaintiff pertaining to suits or recovery. If he violated or intended to violate the Act, the criminal penalties are exclusive. Had the Legislature intended otherwise it would have, and could readily have, said so.

The defendant refers us to four cases on this matter, —Union Nat. Bank v. Louisville, N. A. & C. R. Co. (1893), 145 Ill. 208; Frankel v. Allied Mills, Inc. (1938), 369 Ill. 578; Douthart v. Congdon (1902), 197 Ill. 349; Simpson v. Adkins (1944), 386 Ill. 64.

We do not believe our views to be at variance with those cases. None of them involved the Workmen's Compensation Act or a statute closely analogous thereto in its provisions. In each case the contracts or acts involved,— whether (Union Nat. Bank v. Louisville, N. A. & C. R. Co.) an agreement for excessive interest, or (Frankel v. Allied Mills, Inc.) an unlicensed real estate broker's act, or (Douthart v. Congdon) an unlicensed grain broker's business, or (Simpson v. Adkins) an oil

and gas lease requiring the obstruction of a public highway and the creation of a public nuisance,—were contracts or acts expressly in and of themselves contrary to a statute or ordinance, and constituted the specific doing of or contracting to do a specifically illegal thing. Further, in Union Nat. Bank v. Louisville, N. A. & C. R. Co. the statutes forfeited the entire interest, where there was excessive interest, and thereby, in effect, specifically made the agreement for such void; and in Frankel v. Allied Mills, Inc. the statute specifically forbade suit on the agreement for a commission, thereby, in effect, making it void or voidable, and the New York cases had already previously so held. The contract in the present case is a contract to move a house and to be paid therefor. That is not a contract expressly in and of itself contrary to the present statute, does not constitute the specific doing of or contracting to do some specifically illegal thing, and is not an illegal act. The statute does not void the contract. It does not forbid suit on it. The contract does not appear to be subversive of any public interest which the law cherishes. The consideration is not illegal. Its purpose is not the doing of an unlawful act.

The remaining question has to do with the damages, and as to that we also think there was no error. A recovery may be had, in a proper case, for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty; absolute certainty as to the amount of loss or damages in such cases may not, ordinarily, be attainable, but that is not required to justify recovery; all the law requires is that it be approximated by competent proof; that proof of the exact amount of loss may be impossible does not justify refusing compensation; in cases of this character all the law requires is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages: Barnett v. Caldwell Furniture Co. (1917), 277

403

Ill. 286. The measure of damages where one engaged in the performance of a contract of this type is wrongfully prevented by the other party from completing it is the difference shown by the evidence between the contract price and what it would have cost the plaintiff to have done and completed the work according to the terms of the contract: Hayes v. Wagner (1906), 220 Ill. 256; Ryan v. Miller (1893), 52 Ill. App. 191, 153 Ill. 138; Kingman & Co. v. Hanna Wagon Co. (1898), 176 Ill. 545. If the defendant contended that at the time the contract was breached by him it would have cost the plaintiff more to complete it than the plaintiff had estimated would be the cost, it was incumbent on the defendant to show it: Central Trust Co. v. John M. Smyth Merchandise Co. (1921), 222 Ill. App. 347. Where the president of a plaintiff corporation, who has knowledge of the facts, testifies that its costs were so many dollars and its profit was so many dollars per unit, which testimony stands alone and undisputed, the defendant presenting no evidence that the costs and profit contended for by the plaintiff were not correct or unfair or unreasonable, that is sufficient to sustain a recovery by the plaintiff for such loss of profits; the burden of proving the damages were not correct or unfair was on the defendant who had breached the contract: Capitol Paper Box, Inc. v. Belding Hosiery Mills, Inc. (1953), 350 Ill. App. 68.

The contract price here, which the plaintiff was to receive, was definite,—$900. As to what it would have cost the plaintiff to have done and completed the work according to the terms of the contract, the only evidence in the record is the plaintiff's testimony that he'd been in the business 33 years, he moved about 10 houses a year, he could move this house with his two old trucks, himself, and his two sons, there would be no wage expense, the cost of gas would be about $30, the cost of breakage of planks and blocks would be about $50, the usual breakage on an average size house, he did

not keep track of depreciation on his equipment, he would have had no certain expense for wear and tear, and he would have made an $820 profit. The only equipment or tools involved evidently would have been a 1929 International truck (24 years old in 1953) worth $100 in 1940, a secondhand Chevrolet (at least 17 years old in 1953) worth $200 in 1936, $100 worth of moving wheels, a few jacks worth perhaps $24, and a sledge hammer. Although depreciation on such equipment fairly attributable to this particular contract might theoretically, we assume, have been a proper element of cost to the plaintiff, he said he would have had no certain expense for wear and tear, he did not keep track of depreciation, and in any event that theoretical possible element, under the circumstances, would obviously have been so negligible as to be of no legal significance or consequence,—lex non curat de minimus.

■ Under the circumstances we think there are sufficient criteria by which the probable profits could be estimated with reasonable certainty; absolute certainty was not necessary; it has been approximated by competent proof; and the evidence does, with a fair degree of probability, tend to establish a basis for the assessment of damages. If the defendant felt that it would have cost the plaintiff more to complete the contract than the plaintiff estimated, it was incumbent on the defendant to go forward with some evidence and endeavor to prove it, which he did not do. The defendant, who had breached the contract, having presented no evidence that the costs and profit contended for and testified to by the plaintiff were not correct or unfair or unreasonable, the plaintiff's testimony is sufficient to sustain a recovery of the estimated loss of profits.

■ That the plaintiff's plank breakage element of cost had on some other particular occasion been more than $50 is of no importance if, as the evidence shows, $50 is the usual breakage on an average size house; whether an $820 profit on a $900 contract was usual

and customary in the plaintiff's business is beside the point,—the question is what was his estimated profit on this particular contract under these particular circumstances,—and there is no proof to the contrary; the plaintiff, though an interested witness, was an entirely competent witness,—and the determination of the credibility of the witnesses and weight of the evidence was for the Trial Court,—his testimony is corroborated, if that were necessary, by his statement as to the particular breakdown of costs and by the circumstances; though necessarily almost any contract of this type and any estimate of profits thereunder may be to some degree uncertain, since the actual performance of the contract by the plaintiff is prevented by the defendant, the present case is not within the inhibitions of the precedents against the recovery of alleged damages or profits of a remote, speculative or contingent nature incapable of being reasonably correctly ascertained; although the defendant argues as to certain possible contingencies which might conceivably enter into whether a profit or loss might occur on such a contract he has produced no evidence on those scores; and this is not a case of a so-called "new venture" as to which it may be an estimated loss of profits would be improper, because of uncertainty and speculation and inability to prove that a profit would have been made, —this contract was a part of the plaintiff's regular, established business, as to which he'd had considerable experience, the gross amount he was to receive, $900, was absolutely definite, and his costs on this particular contract, $80, and estimated profit, $820, are established with reasonable certainty under the circumstances.

We've read the defendant's Illinois cases as to the damages question,—Podlaski v. Bender (1909), 150 Ill. App. 312, Salaban v. East St. Louis & Interurban Water Co. (1936), 284 Ill. App. 358, Bauwens v. Goe-

thals (1914), 187 Ill. App. 563, Favar v. Riverview Park (1909), 144 Ill. App. 86, and Chicago Coliseum Club v. Dempsey (1932), 265 Ill. App. 542,—and they are all so different in their facts from the present case that for that and other reasons we do not believe them to be in point here.

The judgment should be, and accordingly is, affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.