WILMETTE PARTNERS, Plaintiff-Appellant, v. RUSS HAMEL, d/b/a Russ's Construction and Excavating, Defendant and Counterplaintiff-Appellee and Cross-Appellant (Richard Keefe *et al.*, Counterdefendants and Cross-Appellees).

First District (1st Division)  No. 1—90—2449

Opinion filed May 4, 1992.—Rehearing denied June 25, 1992.

Roddy, Power & Leahy, of Chicago (Eugene F. Keefe, of counsel), for appellant.

DiMonte & Lizak, of Park Ridge (Riccardo A. DiMonte, of counsel), for appellee Russ Hamel.

No brief filed for other appellees.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

In August and September 1987, plaintiff Wilmette Partners, Ltd. (Wilmette), contracted with Russ Hamel, d/b/a Russ's Construction and Excavating (Hamel), for Hamel to perform demolition and excavation services on improved property which Wilmette owned in the Village of Wilmette. A dispute arose regarding Hamel's performance of the demolition contract, which Hamel never completed. Another contractor subsequently completed the remaining demolition work and excavated the property.

Wilmette instituted this action against Hamel for breach of the demolition contract. Hamel counterclaimed against Wilmette and others (defendants) seeking foreclosure of his mechanic's lien, damages, contractual interest and attorney fees for defendants' breach of the demolition contract, and damages for defendants' anticipatory repudiation of the excavation contract.

After a bench trial, the circuit court of Cook County found that Wilmette had breached the demolition contract and anticipatorily repudiated the excavation contract. The court thereafter entered judg-

ment against Wilmette on its complaint; awarded a mechanic's lien in favor of Hamel in the amount of $18,400 plus costs and interest from the date of contract; entered judgment in favor of Hamel in the amount of $34,300 for Wilmette's breach of the excavation contract; and entered judgment in favor of Hamel in the amount of $7,500 for attorney fees incurred by Hamel through June 21, 1990.

Wilmette appeals alleging numerous contentions, all of which turn on the issue of whether the manifest weight of the evidence supports the court's findings of fact on whose conduct amounted to breach of contract. Hamel cross-appeals, alleging: (1) the circuit court erred when it failed to enter judgment on Hamel's count II, which sought *in personam* damages and contractual interest for breach of the demolition contract; and (2) this court must remand to the circuit court for an award of additional attorney fees to Hamel for having to respond to Wilmette's appeal.

Wilmette is a general partnership with Richard Keefe as general partner and James Allen, among others, as limited partners. Wilmette is the sole beneficiary of a land trust with the La Salle National Bank. The corpus of the trust is three 50-foot lots at 724-726 12th Street in the Village of Wilmette. Hamel is an excavation contractor with seven years' experience in the demolition and excavation field.

Wilmette planned to build a 39-unit condominium building on the property. On August 28, 1987, Hamel and Wilmette entered a written contract in which Hamel agreed to excavate the foundation for the new building and Wilmette agreed to pay $105,000.

On September 8, 1987, Hamel and Wilmette entered a second contract in which Hamel agreed to demolish two existing structures on the property and remove their foundations. The demolition contract required Wilmette to pay Hamel a total of $35,000, with $17,500 payable upon "demolition of [the] structure[s] and removal of substantial amount of brick." Significantly, the demolition contract contained no provisions regarding a commencement or completion date and the contract did not contain any clause stating that "time was of the essence." Other relevant provisions of the demolition contract included the following: (1) an allowance of attorney fees to Hamel for having to enforce the contract; (2) a 2% monthly service charge in favor of Hamel for "past due amounts" owed by Wilmette to Hamel; (3) completion dates being contingent upon events that were beyond Hamel's control (a "force majeure" clause); and (4) the allowance of additional labor charges if "area to be excavated is beyond normal conditions."

On September 9, 1987, Hamel began work under the demolition contract. Hamel testified that he pulled the outside brick from the

buildings and assisted a brick company in salvaging the bricks. He next pulled the two structures down and hauled the material away. The record reflects that, in accordance with the demolition contract's divisibility provision, Hamel received $17,500 at or about this stage of Hamel's performance.

Both parties' witnesses testified that Hamel next removed the existing structures' concrete floors or slabs. The witnesses also agree that Hamel removed two subterranean walls totaling 145 feet in length. The parties are in dispute as to what demolition work Hamel performed beyond this.

Hamel testified that after removing the existing structures' slabs, he encountered two previously unknown, subterranean concrete floors or slabs. One slab measured 90 by 50 feet, the second measured 75 by 50 feet, and both were about five inches thick. Upon removal of these slabs, Hamel discovered two previously unknown, subterranean concrete walls totaling 125 feet in length. Hamel also discovered that one of the known foundational walls, which ran between two of the lots for their entire length (about 200 feet), was an oversized wall in that it was four to five feet thick and deep.

Hamel testified that he brought his discoveries to the attention of Allen. Hamel and Allen discussed the structures and agreed that they had to be removed. Hamel could not give Allen a price for their removal at the time because he did not know how much effort their removal would take. Hamel did state to Allen that he would be reasonable about price. Hamel claimed that he removed these structures and that $3,500 represented a fair, reasonable and customary charge for all the extras he performed. Hamel provided no breakdown for this figure other than stating in general how he reached it.

Regarding what extra walls and slabs Hamel discovered, Wilmette's position is not entirely clear from the evidence. It admits Hamel discovered at least one slab and the extra thick wall. It also admits Hamel discovered yet another, entirely different subterranean wall, approximately 100 feet in length. Wilmette apparently disputes any discovery beyond this although Keefe acknowledges that a dairy previously existed on the property.

Regarding an agreement to perform extras, Wilmette denies that any agreement was reached at the property for Hamel to perform removal of the previously unknown walls and slabs. In this regard, Allen testified that, while he was present at the site on a daily basis, he could not recollect any conversation with Hamel regarding "extras." Keefe, who visited the site on a daily basis, generally denies

that an agreement at the site was reached between Hamel and Allen regarding extras.

On October 14, 1987, a meeting occurred between Hamel, Keefe, Phillip DiMaso,[1] the project's general contractor, and James Williams, the job superintendent, regarding Hamel's performance under the demolition contract. The parties' testimony again conflicts as to what transpired during this meeting.

The testimony of Keefe, DiMaso and Williams regarding what transpired during this meeting can be viewed as paralleling a "confirmatory" letter which Keefe sent to Hamel following the meeting. The letter provided: (1) Hamel agreed to complete the demolition job by Wednesday, October 21, 1987, but was given until Friday, October 23, 1987, to complete the contract; (2) Wilmette agreed to pay an additional $1,000 for Hamel to remove the 100-foot, extra subterranean wall which Hamel discovered; (3) Wilmette would hire another demolition contractor to complete the work in the event Hamel did not finish and would then deduct the completion costs from any amounts owed Hamel; (4) Hamel agreed to release Wilmette from the excavation contract; and (5) upon completion of the demolition contract and Hamel's presentation of a mechanic's lien waiver and a cancellation of the excavation contract, Wilmette would promptly pay all sums due Hamel.

Hamel testified regarding the meeting that he told Keefe, Williams and DiMaso that he would do his best to complete the work in *approximately* one week. DiMaso responded to Hamel that Hamel had 10 days to finish the job and remove himself from the site whether he completed the work or not. Hamel added that DiMaso and Keefe told him that they had a different excavator coming in on Monday, October 26 and that Hamel was to be off the site before that date. Keefe and DiMaso made it clear to Hamel that he would not be doing the excavation work. Hamel denies agreeing to any of the other matters stated in the letter and specifically denies releasing Wilmette from the excavation contract.

Hamel returned to the jobsite following the meeting. Hamel testified that he continued to work diligently through the weekend of October 23, 24, and 25. Wilmette's witnesses testified to the contrary, stating that Hamel made little or no progress after the meeting and, in fact, only knocked off the tops of the foundations and covered them

---

[1]On September 30, 1987, Wilmette's land trust contracted with DiMaso to build the proposed condominium complex for roughly $4.8 million. This contract required DiMaso to perform demolition and excavation at the site.

with debris-laden dirt. In any event, on Sunday, October 25, 1987, Keefe directed Hamel to remove himself and his equipment from the jobsite. Hamel complied.

Testimony conflicted as to what foundations remained following Hamel's removal from the property. Defendant's exhibit No. 1, a "Plat of Survey" of the property, was admitted into evidence and addressed by both parties. Keefe and Hamel agreed that the black lines drawn by Keefe on the exhibit represent subterranean walls remaining on October 25, 1987. According to the scale set forth on the exhibit, the following contractual work approximately remained: 350 feet of foundational wall, two sides of an 8- by 8-foot basement, and two sides of a 20- by 20-foot basement. The noncontractual work which remained amounted to approximately 100 feet of foundational wall (the same wall which Keefe agreed to pay $1,000 to Hamel to remove but which Hamel never removed). Keefe and Hamel dispute whether the "extra-thick" 200-foot wall, which ran between two of the lots, remained or whether Hamel removed the wall.

The following March 9 through March 26, Albrecht Enterprises completed the removal of the foundations and performed excavation services on the property. Previously, on October 15, 1987, the day after the parties' meeting, Albrecht submitted a $15,000 bid to perform excavation work at the property. DiMaso accepted this bid the following February. Once work commenced, Albrecht increased the contract price by $8,000. Wilmette's witnesses testified this increase was due to the cost of trucking from the property approximately 90 loads of debris-laden dirt which Hamel dumped on the property from another construction site or otherwise failed to remove as contractually obligated.

To rebut Wilmette's "cost of completion" figures relative to the demolition contract, Hamel elicited testimony that part of the money Albrecht received was for Albrecht to remove the first four feet of soil across the *entire* site. Keefe admitted that Hamel was not required to do this under the demolition contract, but claimed Hamel's misperformance compelled such work to be done. Hamel also specifically denies using the property as a "dump site."

Hamel also introduced testimony of his own regarding the cost to complete the demolition work. Hamel testified that in his opinion, $3,000 represented a fair, reasonable and customary charge to complete the remaining contractual work.

Hamel also called Carlos Mier and Gerald Shaver to testify as to how much money it would cost to remove the foundations which remained. Mier testified that he was an excavating contractor who had

performed hundreds of excavations and demolitions. On October 27, 1987, Mier's company gave Hamel a written estimate of $2,610 to remove and haul off the site 400 feet of concrete walls. Mier testified that his work would take two days to complete and that his bid represented a fair, reasonable and customary bid for the work he was to perform. Mier added that in late October, he removed from the site four truckloads of debris, with each truck holding 35 cubic yards of material.

On cross-examination, Mier admitted that while the October 27 bid reflected $2,610, the bid did not reflect the removal of 400 feet of concrete wall. Rather, the bid reflected that Mier agreed to remove only 120 feet of wall and a 15 by 20 basement. Mier also admitted that the bids did not include backfilling or hauling "other" debris away which may have existed at the site. Mier finally admitted that the bids he gave to defendant were made at a time when the site was completely level and little or no foundations were exposed.

Gerald Shaver testified that in his opinion as an experienced demolitionist, $2,600 was a fair, reasonable and customary price to remove 400 feet of concrete wall. Shaver testified that this work would take three days to complete. On cross-examination, Shaver admitted that his bid was made at a time when the site was level. Although not cross-examined on the matter, the record shows a $2,500 written bid from Shaver on October 27 for the removal of a lesser amount of concrete.

Finally, Hamel testified regarding his damages resulting from Wilmette's alleged breach of the $105,000 excavation contract. Hamel testified it would cost $70,000 to perform the job, resulting in a profit to him of $34,300. Hamel based his testimony on a worksheet he allegedly prepared when he bid the excavation work. On cross-examination, Wilmette attempted to show that Hamel recently fabricated these figures. The record shows in this regard that Hamel's pretrial and final trial memorandum listed $56,000 as lost profits. Hamel's initial and amended complaint listed $56,250 as lost profits. The record also shows that Hamel's counsel did not disclose prior to trial the worksheet upon which Hamel based his testimony although the sheet was admitted into evidence as a trial exhibit. Wilmette made no motion to exclude the exhibit.

At the close of the evidence, the trial court made the following conclusions of fact: (1) Hamel and Wilmette entered separate demolition and excavation contracts in the amount of $35,000 and $105,000, respectively; (2) during the demolition process, Hamel discovered other buried walls and slabs which Wilmette, through Allen, autho-

rized Hamel to remove and agreed to pay a reasonable price; (3) the reasonable price to complete the extra work was $3,500; (4) Hamel was entitled to additional time to perform the excavation contract due to his discovery of unforeseen subterranean concrete and slabs; (5) Wilmette offered no evidence of the reasonable time in which Hamel was to perform, and the "confirmatory" letter did not confirm anything but was merely self-serving; (6) Hamel substantially performed the demolition contract and was prevented from completing the remainder of the contract by Wilmette's ejection of Hamel; (7) Hamel was entitled to receive as damages under the demolition contract the unpaid contract price of $17,500, plus $3,500 for extras and minus $2,600 to spend to complete the demolition; (8) Wilmette made no evidentiary connection between the rubbish and debris which Albrecht removed from the jobsite and the rubbish and debris which Hamel was required to remove; (9) Wilmette's employment of DiMaso to perform the excavation work amounted to an anticipatory repudiation of the contract entitling Hamel to $34,300 in lost profits; and (10) Hamel was entitled to recover $7,500 in attorney fees through June 21, 1990.

Our resolution of the parties' dispute in this case turns on whether the manifest weight of the evidence supports the court's conclusion that Wilmette breached the demolition contract by failing to allow Hamel a reasonable time to perform. For a judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*In re J.H.* (1987), 153 Ill. App. 3d 616, 630, 505 N.E.2d 1360, 1369.) A reviewing court may not reverse a judgment merely because different conclusions could be drawn or because the reviewing court disagrees, so long as there is evidence to support the judgment. (*Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638, 642, 498 N.E.2d 747, 750.) This is especially true where findings of fact must necessarily be determined from the credibility of the witnesses, a determination the trier of fact in the first instance is best able to make. *In re J.H.*, 153 Ill. App. 3d at 630, 505 N.E.2d at 1369.

The demolition contract in this case required Hamel to remove from the property two existing structures and their foundations. Significantly, the contract contained no commencement or completion date and "no time is of the essence" clause. Equally as significant in this case are the clauses in the contract which provided that Hamel's commencement and completion dates were contingent upon "delays beyond the contractor's control," and that "there will be an additional charge for labor, time, and dump fees if area to be excavated is beyond normal conditions, meaning *** debris in area/soil being excavated."

■ Where a contract does not specify the time for performance, the law implies a reasonable time. (See generally 12A Ill. L. & Prac., *Contracts* §305 n.58, at 157 (1983).) Our cases have defined what constitutes a reasonable time as such time as is necessary to do conveniently what the contract requires. (*Yale Development Co. v. Aurora Pizza Hut, Inc.* (1981), 95 Ill. App. 3d 523, 420 N.E.2d 823.) In the construction setting, we have also noted that a reasonable time is allowed for additional work demanded and executed but not specified in the contract, independent of the general time limits provided by the contract for specified work. (*Raymond Concrete Pile Co. v. Hartman Furniture & Carpet Co.* (1914), 187 Ill. App. 426 (abstract of opinion).) This holding is consistent with another principle; namely, what constitutes a reasonable time is a matter of proof under all the conditions and circumstances that might surround the case. (*Ullsperger v. Meyer* (1905), 217 Ill. 262, 75 N.E. 482; *Adams v. Pendarvis* (1920), 217 Ill. App. 535.) What is a reasonable time is ultimately a question of fact. *Pel-Aire Builders, Inc. v. Jimenez* (1975), 30 Ill. App. 3d 270, 332 N.E.2d 519.

■ In this case, after reviewing the evidence, we find the court's conclusion on the reasonableness of Hamel's performance to be not contrary to the manifest weight of the evidence. Hamel testified that he commenced demolition on September 9, 1987, by pulling down the two existing structures' brick walls. An unrelated company came to the site and salvaged as much brick as possible. Salvation of the brick was not an express contract requirement. Hamel testified that this salvage operation required additional time to perform.

After removal of the brick, Hamel pulled the structures down and hauled the debris to the dump. At or near this time, Hamel received one-half the contract price as provided in the demolition contract.

Hamel next removed the concrete slabs beneath each structure. Upon their removal, Hamel claims that he discovered two additional, previously unknown slabs beneath each building. When these slabs were removed, Hamel claims that he discovered two additional, unknown concrete walls, one 50 feet in length and the other 75 feet in length. Hamel claims to have removed these walls.

Hamel also testified that the 200-foot concrete wall which ran along the lot line between the former structures was discovered to be larger than contemplated. Hamel described this wall as four to five feet thick and four to five feet deep. Hamel claims to have removed this wall.

While Wilmette disputes the discovery and/or removal of some of the structures beneath the buildings' original slabs, the parties agree that Hamel did remove two known walls totaling 145 feet.

On October 23, 1987, Wilmette required Hamel to remove his equipment from the property. At the time of removal, the record reflects that more than 350 feet of contract work remained and about 100 feet of noncontract work remained. The 200-foot, extra large wall may have also existed as well.

The trial court in this case was faced with the issue of what constituted a reasonable time for Hamel to perform the contract in light of the contract and noncontract work which Hamel claimed to have performed. To support its claim that the court wrongly decided the issue, Wilmette places substantial reliance on Hamel's own testimony which Wilmette claims establishes that Hamel's performance exceeded a reasonable time. Hamel testified:

"Q. Based on your experience in the excavation demolition business, what is the reasonable time within which to complete the demolition contract?

A. Assuming I didn't take the time to use laborers to pick through the brick and assuming that the walls were to only be a foot wide and four feet deep I would say a month.

Q. And how much time did it take you to remove the additional slabs and foundational walls you encountered?

A. I'd say anywhere eight to ten days, right in there."

Wilmette contends this testimony establishes that a reasonable time to complete the demolition contract and the extras expired on October 19, 1987, one month and 10 days after Hamel began work on September 9. We disagree.

Hamel's testimony cannot be read as establishing what constituted a reasonable time for performance. Hamel's testimony only can be cited as stating that one month equalled a reasonable time to complete the demolition contract *in the absence of unforeseen circumstances*. Because unforeseen circumstances occurred here, Hamel's testimony is not persuasive. Moreover, contrary to Wilmette's assertions, Hamel's testimony cannot be read as establishing that once *all* unforeseen circumstances are taken into account, one month and 10 days equalled a reasonable time. In this regard, Hamel's testimony does not give a time estimate regarding the salvation of bricks. Accordingly, Hamel's testimony does not establish the reasonable time for performance in this case.

Wilmette also directs this court to Hamel's testimony regarding the amount of demolition work remaining after Hamel was ejected

from the site on October 23, 1987. Hamel testified that the day he left, 250 to 300 feet of contract foundational work remained and 100 feet of noncontract foundation remained. DiMaso testified that it would have taken Hamel another 8 to 10 days to finish the work. Mier and Shaver testified that two to three days would be required to remove 400 feet of concrete.

Wilmette contends that based on the amount of work remaining on October 23, coupled with the time Hamel already spent, Hamel did not complete the demolition work within a reasonable time. We again must disagree. What Wilmette is asking this court to do, and what it asked the trial court to do, is to determine *sua sponte* what constituted a reasonable time to complete the work. Neither this court nor the circuit court has demolition expertise and surely judicial notice on the subject cannot be taken. Absent some evidence to guide the court as to what constituted a reasonable time to complete the demolition work under the circumstances Hamel encountered, the fact that work remained upon Hamel's separation from the property is not persuasive. Similarly unpersuasive is Wilmette's evidence that Hamel was underfunded, inexperienced, and not properly equipped. What Wilmette should have done, and what its breach of contract claim required it to do, is call witnesses who could have educated the trial court on the reasonable time aspect of this case. Having not done this, Wilmette cannot claim as a basis to justify terminating the contract that Hamel's work exceeded a reasonable time.

Another argument Wilmette advances on the reasonableness issue centers on the October 14 meeting between the parties and the "confirmatory" memoranda to which Hamel never responded. Wilmette argues that Keefe, Williams and DiMaso testified consistently that Hamel agreed at this meeting, and the memoranda confirmed, that he needed only a week to complete the job and would be off the site no later than Friday, October 23, 1987. The trial court, however, disbelieved that such an agreement was reached. Instead, the court credited Hamel's testimony that no such agreement occurred and that Hamel only gave an *approximate* time period in which he believed he would finish. As a reviewing court, this court cannot reverse the trial judge's determination that Hamel's testimony regarding the October 14 meeting was more credible than Wilmette's witnesses.

It is worth noting that the trial court's credibility assessment was influenced by the possible existence of Keefe's and DiMaso's underlying motives for removing Hamel from the site. The record shows in this regard that, on September 30, 1987, while Hamel was performing the demolition contract, Wilmette hired DiMaso to act as general con-

tractor for the project. The $4.8 million contract price included demolition and excavation services. On October 15, 1987, the day after the meeting with Hamel, Albrecht Enterprises submitted a proposal to DiMaso to perform excavation of the property; DiMaso accepted the proposal the following February. In closing argument, Hamel's counsel argued that DiMaso, as general contractor, was the "captain of the ship" who did not want Hamel to perform services on the property because Hamel was an outsider to DiMaso. Again, as a reviewing court, we will not disturb the court's credibility assessments.

In summary, we affirm the trial court's conclusion that Wilmette's ejection of Hamel from the property constituted a wrongful termination of the contract and not an abandonment by Hamel. Wilmette offered no direct testimony on the reasonableness issue, and the other evidence it cites does not establish what constituted a reasonable time to perform the demolition contract in light of the conditions Hamel encountered.

■ We similarly affirm the trial court's conclusion that Wilmette anticipatorily repudiated the excavation contract. Unless justified, a definite statement to the promisee that the promisor will not perform its contractual duties constitutes an anticipatory repudiation. (Builder's Concrete Co. v. Fred Faubel & Sons, Inc. (1978), 58 Ill. App. 3d 100, 104, 373 N.E.2d 863, 867.) Upon repudiation, the promisee may, among others, elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance. (Builder's Concrete Co., 58 Ill. App. 3d at 104-05, 373 N.E.2d at 867.) A promisee may pursue such an election by either promptly filing suit or by detrimentally changing his position in reliance on the repudiation. Builder's Concrete Co., 58 Ill. App. 3d at 105, 373 N.E.2d at 867-68.

■ In this case, the evidence is uncontradicted that Hamel was ejected from the site on October 25, 1987. Even before this time, at the October 14 meeting, Keefe made it clear to Hamel that Hamel would not be performing the excavation contract. The record reflects that, notwithstanding his contract, Hamel did not perform the excavation work.

Wilmette asks this court to find that no repudiation occurred merely because Hamel never demanded to perform the excavation contract. However, an anticipatory repudiation continues in effect until affirmatively retracted by the repudiator. (Builder's Concrete Co., 58 Ill. App. 3d at 105, 373 N.E.2d at 868.) Moreover, it is a basic legal tenet that the law never requires a useless act. Christopher v. West (1951), 409 Ill. 131, 98 N.E.2d 722.

We also reject Wilmette's argument that Hamel agreed to release Wilmette from the excavation contract at the October 14 meeting. The trial court rejected this theory of the meeting, and we are in no better position to hold otherwise. We similarly reject on this ground Wilmette's argument that its repudiation was justified based on Hamel's alleged misperformance of the demolition contract. Again, the trial court had before it the evidence of Hamel's performance and was in the best position to determine whether Wilmette was justified in obtaining substitute excavation services.

In light of our conclusions on the issue of breach, Hamel's nonperformance of the remainder of the demolition work and the excavation work was excused. (See *Foreman State Trust & Savings Bank v. Tauber* (1932), 348 Ill. 280, 286, 180 N.E. 827, 829-30; *Builder's Concrete Co.*, 58 Ill. App. 3d at 108, 373 N.E.2d at 870; *Gamm Construction Co. v. Townsend* (1975), 32 Ill. App. 3d 848, 851, 336 N.E.2d 592, 594.) Moreover, whether Hamel substantially performed the demolition contract was not a relevant determination. The doctrine of substantial performance is relevant only where the contractor is in technical breach of contract; the doctrine relieves the contractor of the common law rule that recovery can only be had upon a showing of strict performance of the contract. See *W. E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.* (1986), 115 Ill. 2d 119, 503 N.E.2d 233; *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 356 N.E.2d 565.

Also, contrary to Wilmette's urgings, Hamel's nonperformance under the demolition contract does not defeat his claim under the Mechanics Lien Act (Ill. Rev. Stat. 1987, ch. 82, par. 1 *et seq.*). While normally, under the Mechanics Lien Act, it is a prerequisite to a lien that the contractor complete performance of the contract, an excuse for nonperformance, such as breach of contract, will entitle the contractor to enforce his lien for the value of what has been done. *Luczak Brothers, Inc. v. Generes* (1983), 116 Ill. App. 3d 286, 300, 451 N.E.2d 1267, 1279; *Contract Builders Service Corp. v. Eland* (1981), 101 Ill. App. 3d 366, 428 N.E.2d 178; *Miller v. Reed* (1973), 13 Ill. App. 3d 1074, 302 N.E.2d 131; Ill. Rev. Stat. 1987, ch. 82, par. 4.

We now turn to the damages aspect of this case. The purpose of damages is to place the nonbreaching party in the position he would have been had the contract been performed; the nonbreaching party should not be placed in a better position or provided with a windfall recovery. (*Feldstein v. Guinan* (1986), 148 Ill. App. 3d 610, 499 N.E.2d 535; *Golen v. Chamberlain Manufacturing Corp.* (1985), 139 Ill. App. 3d 53, 487 N.E.2d 121.) The amount of damages

awarded is generally within the discretion of the trier of fact; nevertheless, a reviewing court can order a new trial if the damages are manifestly inadequate, if proved elements of damages have been ignored, or if the award does not bear a reasonable relationship to plaintiff's loss. *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 537 N.E.2d 1348.

■ Addressing Hamel's damages under the demolition contract first, the proper measure of damages for Wilmette's wrongful prevention of completion is the difference shown by the evidence between the unpaid contract price and what it would have cost Hamel to have done and completed the work according to the terms of the contract. (*Meyer v. Buckman* (1955), 7 Ill. App. 2d 385, 404, 129 N.E.2d 603, 613; J. Calamari & J. Perillo, Contracts §14—28 (2d ed. 1970).) Upon review of the evidence, we affirm the amount of damages awarded to Hamel for Wilmette's breach of the demolition contract.

■ Hamel testified that $3,000 represented a fair, reasonable and customary charge to complete the remaining contractual work. Carlos Mier and Gerald Shaver testified that, in their respective opinions, $2,610 and $2,600 represented a fair, reasonable and customary charge to remove and haul off the site 400 feet of concrete walls. Based on this evidence, the court found that $2,600 represented the cost to Hamel to complete the contract.

In affirming the demolition contract damages award, we agree that the monies paid Albrecht Enterprises is not persuasive evidence to use in calculating the award. What costs Albrecht incurred to complete the demolition contract represented Wilmette's cost of completion, not Hamel's. If Hamel were the party in breach, the reasonable cost Wilmette incurred to complete the remaining work would be a relevant consideration (J. Calamari & J. Perillo, Contracts §14—29, at 561 (2d ed. 1970)); as Hamel is not, Wilmette's figures are not appropriate.

Although we may have reached a different figure, whether the trial court determined $2,600 to be the appropriate credit due Wilmette was within its discretion. In affirming this figure, we are aware that Mier and Shaver on cross-examination admitted to making a previous written bid which reflected a lesser amount of concrete, that their bids were made at a time when foundations were not exposed, and that their bids did not include the cost of removing any debris which remained. However, Mier and Shaver were at the property during the demolition process and observed the foundations. Also, we are not persuaded that significant debris remained on the property in late October as Wilmette would not have paid Hamel

$17,500 unless, according to the contract, Hamel had in fact removed "substantial" amounts of debris. Again, while this court may have reached a different figure, we cannot say the figure is against the manifest weight of the evidence or falls outside the court's discretionary powers.

■ We now focus on Hamel's damages for Wilmette's anticipatory breach of the excavation contract. Courts apply three general principles when determining whether lost profits are to be allowed as compensation in contract cases. Lost profits will be allowed only if (1) their loss is proved with a reasonable degree of certainty, (2) the court is satisfied that the wrongful act of the defendant caused the loss of profits, and (3) the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered. (*Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 538-39, 346 N.E.2d 494, 496-97.) Relative to the last principle, when the profits sought are those arising out of the breached contract, the profits are considered one of the elements of the contract and are presumed to have been within the contemplation of the defaulting party at the time he entered the contract; they are recoverable if proved with reasonable certainty. (*Rivenbark*, 37 Ill. App. 3d at 539, 346 N.E.2d at 497.) Finally, prospective profits are ascertained by deducting from the contract price those expenses necessary for full compliance on plaintiff's part. *Rivenbark*, 37 Ill. App. 3d at 539, 346 N.E.2d at 497; *Meyer v. Buckman* (1955), 7 Ill. App. 2d 385, 404, 129 N.E.2d 603, 613; J. Calamari & J. Perillo, Contracts §14—28 (2d ed. 1970).

■ In this case, Wilmette attempts to overturn the profits award on the ground that plaintiff fabricated his figures during trial. At trial, Hamel testified it would cost him roughly $70,000 to complete the $105,000 excavation contract. He claimed lost profits in the amount of $34,300. Hamel based his testimony on a worksheet he claimed to have prepared when he bid the excavation work. On cross-examination, Wilmette attempted to show that Hamel recently fabricated these figures based on various pleading and documents filed with the court and the parties' disclosed exhibits prior to trial.

We believe the trial court was in a better position to determine whether Hamel had recently fabricated his figures as Wilmette alleges. Also, if Hamel failed to disclose a trial exhibit, and such failure violated a pre-trial order or other rule of civil procedure, it was incumbent upon Wilmette to file a proper motion. Wilmette has called no such motion to the attention of this court.

Wilmette further urges this court to find that Hamel's lost profits were not calculated with reasonable certainty. Our review of Hamel's

profit exhibit, however, reveals that Hamel's cost figures are reasonably set forth in the exhibit. The exhibit includes the lot size[2] to be excavated, the depth of excavation, the cost per yard to dig and haul away the dirt, machinery rental costs and labor. We believe that the trial court could rely on these figures to determine the amount of profit.

We next address whether Hamel was entitled to an award of extras. We hold he was not and vacate the trial court's award.

In *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 390, 226 N.E.2d 270, 276, this court reviewed Illinois law on the matter of extras and established the prerequisites for their recovery. To recover compensation on the ground that he performed extras, a contractor must make the following showings by clear and convincing evidence: (1) the work was outside the scope of his contract promises; (2) the extra work items were ordered by the owner; (3) the owner agreed to pay extra, either by his words or conduct; (4) the contractor did not furnish the extras as his voluntary act; and (5) the extra items were not rendered necessary by any fault of the contractor. Cases subsequent to *Guennewig* have followed its approach. *Wingler v. Niblack* (1978), 58 Ill. App. 3d 287, 374 N.E.2d 252; *R & R Construction Co. v. Junior College District No. 529* (1977), 55 Ill. App. 3d 115, 370 N.E.2d 599; *Watson Lumber Co. v. Mouser* (1975), 30 Ill. App. 3d 100, 110, 333 N.E.2d 19; *Bulley & Andrews, Inc. v. Symons Corp.* (1975), 25 Ill. App. 3d 696, 323 N.E.2d 806.

In this case, the problem with Hamel's proof is that he never demonstrated by clear and convincing evidence what amount of "extra" concrete he removed or how he arrived at his figure of $3,500. In this regard, the evidence on what extra concrete was discovered and which of this concrete was removed was utterly conflicting. Under *Guennewig*, Hamel carried the burden of proving by clear and convincing evidence that he discovered an extra; that Wilmette agreed to its removal; and that Wilmette agreed to pay additional money. This quantum of proof was required as to each of the alleged walls or slabs Hamel discovered. It is clear from our review of the evidence that Hamel did not meet this mark. At best, Hamel only demonstrated that a general discussion occurred between him and Allen at the property when an alleged wall or slab was discovered. Under

---

[2]Wilmette attacks Hamel's cost figures on the ground that Hamel's calculations are based on an improper lot size. Wilmette contends the actual lot size is 27,500 square feet while Hamel uses a figure of 21,875 square feet. As Wilmette never specifically advanced this argument below, it has waived review of the matter.

*Guennewig*, general discussion cannot be used to supply all of the elements necessary to the recovery of extras.

In a similar vein, the parties' contract did not supply all the elements for the recovery of extras. The contract expressed that work beyond the stated contract would be an extra, but it did not blindly bind Wilmette to pay for the performance of extras. Rather, we believe Hamel must nevertheless show as to each extra, that Wilmette agreed to its removal and to pay an additional price. Again, Hamel did not make this showing. For these reasons, we vacate the award of extras to Hamel.

The final matter before the court concerns Hamel's cross-appeal. We grant the relief he seeks.

Hamel's counterclaim consisted of two counts. Count I sought foreclosure of a mechanic's lien. Count II sought a personal damages award against Wilmette and Keefe for breach of the demolition contract. Count II also sought a penalty for vexatious refusal to pay and contractual interest in the amount of 2% for "past due amounts." In its judgment, the court found no vexatious refusal to pay, and Hamel has not appealed this finding. In entering judgment, however, the court entered judgment against Hamel on count II even though it found Wilmette in breach of contract. This was erroneous. Hamel was entitled to judgment against Wilmette and Keefe personally for breach of the demolition contract. Accordingly, on remand, the court shall enter judgment in favor of Hamel and against Keefe and Wilmette in the amount of $14,900, plus 2% interest from the date of judgment.

Regarding Hamel's claim for additional attorney fees, the parties' contract provided for Hamel's reimbursement of attorney fees if he had to enforce the demolition contract. This appeal is part of Hamel's enforcement efforts. Accordingly, we remand this case to the trial court for the consideration of Hamel's attorney fees incurred since June 21, 1990. We otherwise affirm the $7,500 award of attorney fees through June 21, 1990.

In summary, we affirm the circuit court of Cook County's judgment awarding Hamel $14,900 for breach of the demolition contract, $34,300 for lost profits on the excavation contract, and $7,500 for attorney fees through June 21, 1990. We vacate the court's judgment as to the award of extras. We remand to the circuit court with instructions to enter judgment in favor of Hamel and against Wilmette and Keefe personally in the amount of $14,900 for breach of the demolition contract, plus 2% contractual interest from the date of judgment.

We also remand to the circuit court for consideration of Hamel's attorney fees incurred since June 21, 1990.

Affirmed in part; reversed in part and remanded with directions.

CAMPBELL and O'CONNOR, JJ., concur.